**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **VINCENT SIMIEN,** <br><br> **Plaintiff,** <br> **v.** <br><br> **MARKWAYNE MULLIN,** <br> **Secretary of Homeland Security,** <br><br> **Defendant.**[1] | **Case No. 23-cv-888 (GMH)** |

**MEMORANDUM OPINION**

This is an employment retaliation matter involving the Federal Emergency Management Agency ("FEMA"), which is a subagency within the Department of Homeland Security headed by Defendant, the Secretary of Homeland Security. For several months in 2016, Plaintiff Vincent Simien was a Reservist Public Assistance Specialist. Issues arose during his deployment to a disaster in Longview, Texas, when there were complaints about his behavior. He was demobilized from the Longview disaster site on June 10, 2016, immediately after which he contacted FEMA's Office of Equal Rights to complain that he had been discriminated against on the basis of his race and gender. Plaintiff was terminated from FEMA on July 8, 2016. Shortly thereafter, a tentative job offer with a different FEMA cadre was rescinded.

Plaintiff's federal complaint alleged retaliation, racial discrimination, and a hostile work environment in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, but the racial discrimination and hostile work environment claims did not survive Defendant's

[1] The current Secretary of Homeland Security is substituted as Defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

motion to dismiss. Following discovery, Defendant moves for summary judgment on the remaining claim for retaliation.[2] The motion will be granted.

## I. BACKGROUND[3]

In January 2016, FEMA hired Plaintiff as a Reservist Public Assistance Specialist. ECF No. 71-1, ¶ 1; ECF No. 73-1 at 2, ¶ 1. In April of that year, he was deployed to a disaster in Longview, Texas. ECF No. 71-1, ¶ 2; ECF No. 73-1 at 2, ¶ 2. From May 17, 2016, to June 9, 2016, Plaintiff's first-line supervisor was Peggy Kemler. ECF No. 71-1, ¶ 4; 73-1 at 2, ¶ 4.[4]

The record reflects that Plaintiff's short tenure in Texas was rocky from the start. According to Plaintiff, soon after he was deployed, Kemler instructed him to "'scout' some local hotels in Longview." ECF No. 71-2 at 28 (Plaintiff's Equal Employment Opportunity ("EEO") affidavit); *see also* ECF No. 71-3 at 50 (Plaintiff's deposition transcript). Plaintiff has explained that he visited several hotels, asked if they had a lower rate for federal employees, and, in at least one instance, asked hotel personnel whether hotel guests "had experienced any vehicle thefts or burglaries" while staying at the establishment. ECF No. 71-2 at 28–29. When he reported back to Kemler, she chastised him for attempting to negotiate a deal for FEMA employees, a charge

---

[2] The relevant docket entries for the purpose of this Memorandum Opinion are: (1) Defendants' Motion for Summary Judgment, Statement of Material Facts as to Which There is no Genuine Dispute, and attachments, ECF Nos. 71 through 71-20; (2) Plaintiff's Opposition to Defendant's Motion for Summary Judgement, Statement of Genuine Issues of Material Fact and Additional Material Facts in Dispute, and attachments, ECF Nos. 73 through 73-5; and (3) Defendant's Reply and Response to Plaintiff's Statement of Undisputed Material Facts, ECF Nos. 74 through 74-1. The page numbers cited herein are those assigned by the Court's CM/ECF system.

[3] Except where noted, the following facts are undisputed either because the parties have agreed there is no dispute or because they appear in the documentary evidence and are otherwise uncontroverted.

[4] Defendant claims that Kemler was Plaintiff's supervisor until June 10, 2016, presumably because, as discussed below, that was the date he was informed of his demobilization; however, Plaintiff's affidavit, which is the document Defendant cites for that fact, reflects a date of June 9, 2016, presumably because, as also discussed below, that was the date Plaintiff was instructed to leave the disaster site at which he had been working and to report the next day to a superior in Austin, Texas. *See* ECF No. 71-1, ¶ 4 (citing page designated FEMA_000899); ECF No. 71-2 at 3 (page designated FEMA_000899 reflecting that Kemler was Plaintiff's supervisor until June 9, 2016). The precise date is not material to the resolution of this motion.

Plaintiff denied. *See id.* at 29. Later, a hotel employee apparently informed Kemler that Plaintiff had performed a "safety and security check" on the hotel, which he was not authorized to do. *See* ECF No. 71-4 at 3.

A few weeks later, on the morning of June 8, 2016, one of Plaintiff's colleagues, Denise Smith, sent an email to Kemler. ECF No. 71-9 at 2. She reported that on June 3, Plaintiff said that he hoped Kemler would get "flat tires on all of her tires" to "inconvenience her." *Id.* She further asserted that Plaintiff had said Smith was "stupid," called other members of the team "old man" and "Kid," and had "threaten[ed]" to "cut" one of his co-workers. *Id.* Smith stated she was "not comfortable working around" Plaintiff, who was "negative, aggressive, unprofessional[,] . . . insecure," and "bullying."[5] *Id.* Later that same day, another co-worker, Karl Schneider, submitted a memorandum to Kemler. *See* ECF No. 71-8 at 2–3. That memorandum reflects that Schneider had been asked to "document" his "interactions and or observations" of Plaintiff. *Id.* at 3. Among other things, Schneider reported that Plaintiff complained about his superiors; expressed "disdain" for Kemler; and had remarked that Kemler "should get four flats" on her car, after which he made a "flicking off" gesture.[6] *Id.* at 3. Schneider further asserted that, while conversing with a hotel guest, Plaintiff "made gestures of 'I'll stab you with this plastic fork' as a means of stating his point" and had remarked to Schneider, "I'll stab you," after which both he and Schneider laughed. *Id.* at 4. Schneider disapproved of the "wishes of harm" to Kemler and

---

[5] These statements are reflected in the email from Smith to Kemler, which is in the record. *See* ECF No. 71-9 at 2. Plaintiff does not dispute that the statements were made, but "disputes the[ir] truth and characterization." ECF No. 73-1 at 3, ¶ 9.

[6] Kemler is identified as Plaintiff's "PACL" or "Public Assistance Crew Leader" in this memo. *See, e.g.*, ECF No. 71-7 at 2 (identifying Kemler as Plaintiff's "Public Assistance Crew Leader (PACL)"); *see also* ECF No. 71-8 at 2 (Kemler's email signature block identifying her as "PA Crew Lead"). Elsewhere, she is identified as Plaintiff's "PAC Lead." *See, e.g.*, ECF No. 73-4 at 3.

concluded that, although Plaintiff's "bark may be bigger than his bite," federal employees are "held to a higher standard" of behavior "whether on the clock or off the clock."[7] *Id.* at 3–4.

The next day—June 9, 2016—Plaintiff was directed by Kemler's supervisor, Inter-Branch Director Robert Schulte, to transfer his work product to another employee, check out of his hotel, and report the next day to the Joint Field Office (known as the "JFO") in Austin, Texas, to meet with Brian Slie, who was the Task Force Lead for that Joint Field Office. *See* ECF No. 74-1, ¶ 1; *see also* ECF No. 71-1, ¶ 7; ECF No. 73-1 at 3, ¶ 7. According to Slie, he had been directed by Federal Coordinating Officer Bill Doran to demobilize Plaintiff from the Longview disaster site.[8] *See* ECF No. 73-2 at 19. On June 10, Plaintiff met in Austin with Slie, who informed him he was being demobilized. ECF No. 71-1, ¶ 10; ECF No. 73-1 at 4, ¶ 10. Plaintiff testified at his deposition that Slie also stated that he would make sure Plaintiff was fired. ECF No. 74-1, ¶ 10; *see also* ECF No. 71-11 at 3–4 (Plaintiff describing the meeting with Slie in a letter of June 17, 2016). In the meeting, Plaintiff insisted that he had received no counseling or warnings about his job performance or behavior, ECF No. 74-1, ¶ 2, and an email in the record indicates that Slie left the meeting to contact two of Plaintiff's supervisors—one of them Kemler—to check the truth of that statement; both indicated Plaintiff had received counseling, *see* ECF No. 71-7 at 2. At the end of that June 10 meeting, Plaintiff requested to speak with an Equal Rights Officer and was escorted to the Office of Equal Rights, where he initiated informal Equal Employment Opportunity ("EEO") counseling. ECF No. 74-1, ¶¶ 3–4; *see also* ECF No. 71-1, ¶ 11. Plaintiff acknowledges that his

---

[7] These statements are reflected in the memo from Schneider to Kemler, which is in the record. ECF No. 71-8. Again, Plaintiff does not dispute that those statements were made; he "disputes the[ir] truth and characterization." ECF No. 73-1 at 3, ¶ 8.

[8] "The Federal Coordinating Officer, or FCO, is appointed by the President 'immediately upon the declaration of a major disaster or emergency' to appraise the situation, establish field offices, and coordinate the administration of relief." *Wilson v. Noem*, No. 20-cv-100, 2025 WL 1000666, at *4 n.15 (D.D.C. Apr. 3, 2025) (quoting 42 U.S.C. § 5143(a)–(b)).

request for "Equal Rights/EEO assistance on June 10, 2016," is the protected activity on which he bases his retaliation claim. ECF No. 73 at 2. According to the initial EEO Counselor's Report in the record—dated July 19, 2016—shows that Plaintiff complained on June 10, 2016, about discrimination at the hands of Slie, Kemler, and Smith. *See* ECF No. 73-4 at 2 ("On June 10, 2016, Complainant filed a complaint stating he believed he was discriminated against based on his Race and Sex due to his treatment [by Slie] upon arrival at the Austin, TX JFO on this same date and other experiences during his deployment."), 5 ("Complainant believes he was discriminated against because he was verbally humiliated continually by his white female team lead"—Kemler—"and falsely accused by a black female trainee"—presumably Smith—"of making threats to do physical harm to individuals on his team and making a comment about how flat tires might be a method by which to increase the time frame the Team had to complete a project."), 13. That report also reflects that, because Plaintiff asserted that he had not received counseling "regarding poor work performance or inappropriate behavior," Kemler began soliciting statements on June 10, 2016, from Plaintiff's colleagues and senior staff members "in an effort to document previously undocumented or false acts attributed to [Plaintiff] and other untrue statements in an effort to show that [Plaintiff] received formal counseling regarding his performance and behavior." *Id.* at 3. On the evening of June 10, 2016, Slie sent an email to Laycee Kent, a Supervisory Reservist Program Manager, thanking her for her "guidance during [their] conversation [that] afternoon" and "recap[ping] the information provided during [that] phone call," including that Plaintiff had consulted with the Equal Rights Office.[9] *See* ECF No. 71-7 at 2; ECF No. 71-1, ¶ 5; ECF No. 73-1 at 3, ¶ 5; ECF No. 74-1, ¶ 3.

[9] The email reflects that it also included Plaintiff's performance evaluation, which Slie apparently drafted. *See* ECF No. 71-7 at 2; ECF No. 73-2 at 19–20. The evaluation is not in the record before the Court.

On June 13, 2016, Kent—who was responsible for addressing performance issues for Reservists in the Public Assistance Cadre[10]—had a phone conversation with Plaintiff about the events leading up to his demobilization. ECF No. 71-1, ¶¶ 5, 12; ECF No. 73-1, ¶¶ 5, 12; ECF No. 71-4 at 2. In an incident report created afterwards, Kent asserted that Plaintiff admitted to making a comment about "flattening all 4 tires of his supervisor" and "mention[ing] that he would stab a co-worker with a plastic fork." ECF No. 71-10 at 2. The incident report reflects that during the June 13 call, Kent asked Plaintiff to submit a written account of the incidents leading up to his demobilization. *See id.* In an email to Slie on June 13, Kent also requested "[s]upporting documentation from field leadership," regarding "the events that led to [Plaintiff's] demobilization." ECF No. 71-5 at 6; *see also* ECF No. 73-5 at 1. Plaintiff submitted a statement on June 17, 2016, which, in large part, provided Plaintiff's account of his meeting with Slie on June 10. *See* ECF No. 71-11. On June 20, Kent emailed Kemler to ask for an email Kemler sent on June 8 to "leadership regarding [Plaintiff's] recent behavior."[11] ECF No. 71-12 at 2; *see also* ECF No. 71-1, ¶ 14; ECF No. 73-1 at 4, ¶ 14.

On July 8, 2016, Kent sent Plaintiff a Notice of Termination, effective immediately. ECF No. 74-1, ¶ 15. The notice cited four instances of inappropriate conduct: (1) in May 2016, when Plaintiff was attempting to find a hotel that could be used during the Texas deployment, Plaintiff performed an unauthorized safety and security check on the hotel, (2) on June 3, 2016, Plaintiff told coworkers that he hoped Kemler would get "four flat[] [tires] and into a[] [car] accident" and not return, (3) on June 3, 2016, Plaintiff referred to one coworker as an "old man," another as a

[10] Kemler's supervisor Schulte, who ordered Plaintiff to report to Slie in Austin, was not in Kent's chain of command. *See* ECF No. 71-5 at 4.

[11] That June 8, 2016, email from Kemler does not appear to be in the record before the Court.

"kid," and a third as "stupid," and (4) on June 8, 2016, Plaintiff stated to a hotel guest that he would "stab her with a plastic fork." ECF No. 71-4 at 2–3. Citing "FEMA Instruction 1200.1," which reportedly states that "it is the responsibility of all employees, including other persons supporting FEMA's mission, to: . . . Respect all persons and government property, and refrain from behavior that could be perceived as threatening, harassing, intimidating, or dangerous to yourself or others,"[12] Kent concluded that Plaintiff's behavior was "perceived as threatening and reflected poor judgment," was "improper, unsuitable, and detracted from [Plaintiff's] character and reputation," and thus was "inconsistent with what is expected of FEMA employees." *Id.* at 3–4. Considering the circumstances and the evidence, which included "numerous witness statements," Kent determined that Plaintiff should be terminated from the agency. *Id.* at 4.

On July 18, 2016, Plaintiff appealed his termination in a 16-page letter to John Wilmot, a Certifying Official in the Public Assistance Division. *See* ECF No. 71-6; *see also* ECF No. 71-1, ¶ 17; ECF No. 73-1 at 5, ¶ 17. He asserted that he was first made aware of the reasons for his demobilization when he received the termination letter from Kent and noted that he had not been "formally or informally advised that [he] was being counseled" during his tenure in Texas. ECF No. 71-6 at 2 (emphasis omitted). Plaintiff then addressed the four specifications of inappropriate conduct. As to the allegation that he had performed an unauthorized safety and security check at a hotel, Plaintiff offered details as to his scouting of various hotels in Longview in May 2016, including that he asked personnel at one hotel "if any of the lodging guests had experienced any vehicle thefts or burglaries" because he had been informed that the area "was prone to vehicle thefts and burglaries." *Id.* at 4. Plaintiff denied that he had falsely informed any hotel personnel that he was conducting a safety and security check. *See id.* at 3. Plaintiff likewise denied that he

[12] The regulation itself is not in the record, but Plaintiff does not contend that Kent misrepresented its content in the termination letter.

"stated or implied" that he hoped Kemler would get into a car accident or that she would not return. *Id.* at 8. Rather, he admitted that he "made a joke" to Schneider that Kemler "should get four flat tires" so that the team would have more time to finish their work before Kemer returned from an errand. *Id.* at 7. As to his use of the terms "old man," "kid," and "stupid," Plaintiff allowed that he might have referred to team members as "old man" or "kid" in jest and might have stated that a joke was "stupid," but he "never told or implied to any of [his] team members that they were stupid." *Id.* at 10. Finally, Plaintiff "categorically den[ied] that [he] engaged in any inappropriate conduct and commented to any female hotel guest that [he] would 'stab her with a plastic fork.'"[13] *Id.* Wilmot denied Plaintiff's appeal on July 27, 2016. *See* ECF No. 71-13.

Meanwhile, Plaintiff apparently had a job interview—it is unclear from the record precisely when that interview occurred—with Ash Hayes, Security Cadre Coordinator, for a position in FEMA's Security Cadre. *See* ECF No. 71-15 at 3. According to Hayes—without contradiction from Plaintiff—he was unaware of Plaintiff's demobilization or termination status and did not ask about it at the interview. *Id.* Similarly, Plaintiff points to no evidence that Hayes was aware that Plaintiff had sought EEO counseling on June 10, 2016. ECF No. 74-1, ¶ 18. On July 11, 2016, Christina Meissinger, a FEMA Human Resources Specialist in the Talent Acquisition Division, tentatively offered Plaintiff a position as a Security Manager, subject to a "favorable security background investigation." ECF No. 71-16 at 3–4. Plaintiff accepted the offer and FEMA initiated the security background investigation. ECF No. 74-1, ¶ 16. On July 21, 2016, Meissinger emailed

[13] Plaintiff maintained materially similar positions during his deposition. *See* ECF No. 71-3 at 52 (asserting that he did not conduct "a safety and/or security check for FEMA" but he might have asked hotel personnel about "safety"), 54 (asserting that he "may have said, well, if [Kemler] got four flat tires, we would have more time to complete our document" but "at no time did [he] ever say she should get into a car accident nor that [he] hope[d] she wouldn't return"), 57–61 (stating that he might have called Schneider "old man" as "playful fodder," denying that he called anyone "kid," and explaining that if he used the term "stupid," he would have been referring to a joke rather than the individual making the joke), 61–62 (stating that he had "absolutely no knowledge" about the specification alleging he stated he would stab someone with a plastic fork). Defendant has since admitted that Plaintiff did not state he wanted Kemler to get into a car accident. *See* ECF No. 74-1, ¶ 14.

Jessica Willard, a Human Resources Specialist, regarding Plaintiff's "transfer from [Public Assistance]" to his new cadre, which was to occur on August 7, 2016. ECF No. 71-17 at 2–3; *see also* ECF No. 71-1, ¶ 24; ECF No. 73-1 at 6, ¶ 24. That same day, Willard informed Meissinger that FEMA had "terminated [Plaintiff] on July 8, 2016, for threatening his co-workers while deployed." ECF No. 71-1, ¶ 25; ECF No. 73-1 at 6, ¶ 25. Meissinger in turn informed Hayes and instructed him to consult with Employee Relations Specialist Patricia Silva about the situation. ECF No. 71-1, ¶ 26; ECF No. 73-1 at 6, ¶ 26. It appears Hayes and Silva spoke on July 22 and, afterwards, Hayes instructed HR to rescind the tentative job offer "[b]ased on the circumstances of the termination (inappropriate conduct while on deployment)." ECF No. 74-1, ¶ 19; *see also* ECF No. 71-15. Meissinger informed Plaintiff of the rescission on July 25, 2016. ECF No. 71-1, ¶ 30; ECF No. 73-1 at 7, ¶ 30. The communications in the record before the Court reflect emails relevant to the rescission of Plaintiff's tentative job offer among only those four FEMA personnel (Hayes, Meissinger, Willard, and Silva), the Security Cadre's Reserve Coordinating Manager (Tiffany Edwards), another FEMA official whose position is unclear (Sabrina McEvoy); Plaintiff points to no evidence that Kent was contacted about the job offer, provided input relating to it, or was involved in any way in the decision to rescind it. *See* ECF Nos. 71-14, 71-15, 71-17, 71-18; ECF No. 73-2 at 21. Plaintiff also fails to point to evidence that Meissinger, Willard, Silva, Edwards, or McAvoy were aware of his protected activity. Plaintiff filed a formal complaint with FEMA's Office of Equal Rights on August 6, 2016—which post-dates the conduct he challenges as retaliatory here. *See* ECF No. 71-20.

Plaintiff initiated this action in the U.S. District Court for the Central District of California in September 2022 and the parties later stipulated to its transfer here. *See* ECF No. 1; ECF No. 23. In March 2024, Judge Cooper granted Defendant's motion to dismiss Plaintiff's claims for

discriminatory and retaliatory hostile work environments and for racial discrimination. *See Simien v. Mayorkas*, No. 23-cv-888, 2024 WL 1213397 (D.D.C. Mar. 21, 2024). Thereafter, the parties consented to the jurisdiction of a Magistrate Judge and the case was assigned to this Court with only the retaliation claim intact. ECF No. 49; Minute Entry (June 3, 2024).

Following discovery, Defendant moved for summary judgment on the retaliation claim. *See* ECF No. 71. That motion is now ripe for adjudication.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). While the court must view the evidence in the light most favorable to the non-moving party and draw all

reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleadings' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants v. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute). Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party. *Anderson*, 477 U.S. at 249 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)). In short, "[s]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Nasser v. District of Columbia*, 962 F. Supp. 2d 234, 242 (D.D.C. 2013) (quoting *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)).

It is well established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)). A court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Barnett*, 715 F.3d at 358. Moreover, district courts approach summary judgment motions in employment discrimination or retaliatory action cases

with "special caution" due to the "potential difficulty for a plaintiff . . . to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014) (quoting *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)). Nonetheless, a plaintiff is still obligated to support his or her allegations by competent evidence, and a plaintiff may not avoid summary judgment through "conclusory allegations and speculation." *Nurriddin*, 40 F. Supp. 3d at 115.

### B. Title VII Retaliation

Title VII, 42 U.S.C. § 2000(e) *et seq.*, prohibits the federal government from retaliating against employees who complain of employment discrimination. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

Retaliation claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework. *Jones,* 557 F.3d at 677; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). "Under that framework, a plaintiff must first establish a prima facie case of retaliation by showing (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones*, 557 F.3d at 677 (citing *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)); If the plaintiff establishes a prima facie case, the burden shifts to the employer to provide a "legitimate non[retaliatory] reason" for the adverse employment actions. *Jones*, 557 F.3d at 677 (quoting *Wiley*, 511 F.3d at 155).

On a motion for summary judgment, if the employer establishes a legitimate nonretaliatory reason, the court should not consider whether the plaintiff has established a prima facie case. *Id.* at 678 ("At this stage in the litigation, . . . asking whether [the plaintiff] satisfied his prima facie burden is an unnecessary and improper 'sideshow.'" (quoting *Brady v. Off. of Sergeant at Arms*,

520 F.3d 490, 494 (D.C. Cir. 2008)). Instead, "the burden-shifting framework disappears, and a court . . . looks to whether a reasonable jury could infer . . . retaliation from all the evidence." *Id.* at 677. At that point, "the only question is the 'ultimate factual issue in the case'—'[retaliation] *vel non*.'" *Id.* at 678 (quoting *USPS Bd. of Gov. v. Aikens*, 460 U.S. 711, 714–15 (1983)); *see also Brady*, 520 F.3d at 494 ("[B]y the time the district court considers an employer's motion for summary judgment . . . , the employer ordinarily will have asserted a legitimate, non-[retaliatory] reason for the challenged decision—for example, through a declaration, deposition, or other testimony from the employer's decisionmaker."). In other words, "the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation 'either directly by [showing] that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Jones*, 557 F.3d at 678 (first alteration in original) (quoting *Aikens*, 460 U.S. at 716). Significantly, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). The court should consider all evidence in the record, including evidence introduced to support the prima facie case; evidence of pretext—evidence the plaintiff offers to "attack the employer's proffered explanation"; and other evidence of retaliation. *Id.* (quoting *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)).

## III. DISCUSSION

Although it is not entirely clear from his briefing, Plaintiff appears to argue that the first retaliatory act was his demobilization on June 10, 2016; he also claims that his termination on July 8, 2016, and the withdrawal of his tentative job offer in late July 2016 were retaliatory. *See* ECF No. 73-1 at 7, ¶ 31 ("Plaintiff alleges that his demobilization, termination, and the withdrawal of

his Tentative Job Offer were in retaliation for his June 10, 2016 protected EEO activity."); *but see* ECF No. 73 at 1 (Plaintiff asserting, "The only remaining claims are retaliation claims arising from Plaintiff's July 8, 2016 termination and FEMA's subsequent withdrawal of a tentative Security Manager offer."). The parties agree that, because Defendant has proffered a legitimate non-discriminatory reason for its actions—Plaintiff's alleged inappropriate conduct—the relevant question is whether a jury could find that reason was a pretext for retaliation. *See* ECF No. 73 at 2 (Plaintiff stating, "The question, then, is whether a reasonable jury could find that FEMA acted because Plaintiff sought Equal Rights/EEO assistance on June 10, 2016, or whether the agency's stated reasons reflect an ordinary, non-retaliatory process."); ECF No. 74 at 1 ("Plaintiff concedes that the sole issue for this Court to decide is whether FEMA's stated reasons for the adverse employment actions were a pretext for retaliation for Equal Employment Opportunity ('EEO') contact on June 10, 2016."). The Court will therefore address each of the alleged retaliatory actions in turn, focusing on that question.

### A. Demobilization

Timing matters in a retaliation claim, because both law and logic dictate that a retaliatory act must post-date the conduct motivating it. *See, e.g.*, *Barnes v. Hegseth*, No. 23-cv-932, 2025 WL 915564, at *4 (D.D.C. Mar. 26, 2025) ("[T]he fact that the alleged retaliatory actions preceded the protected activity precludes a determination that the protected activity caused the defendant to retaliate against the plaintiff." (quoting *Lewis v. Columbia*, 653 F. Supp. 2d 64, 79 (D.D.C. 2009))). "[A]n adverse employment action that was already contemplated before a plaintiff engaged in protected activity cannot be evidence of retaliation." *Terveer v. Billington*, 34 F. Supp. 3d 100, 119 (D.D.C. 2014) (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been

filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.")). It is clear from the record that Plaintiff's protected activity—his request to speak to an EEO counselor at the close of his meeting with Slie on June 10, 2016—came after the decision to demobilize him.

On June 9, 2016, Inter-Branch Director Robert Schulte directed Plaintiff to transfer his work product to another employee, check out of his hotel, and report to the Joint Field Office in Austin, Texas, to meet with Slie. *See* ECF No. 74-1, ¶ 1; *see also* ECF No. 71-1, ¶ 7; ECF No. 73-1 at 3, ¶ 7. Slie asserted that he had been instructed to demobilize Plaintiff by the Federal Coordinating Officer, Doran. *See* ECF No. 73-2 at 19. Plaintiff describes the June 10 meeting with Slie in some detail in his June 17, 2016, letter to Kent. Plaintiff asserts that he traveled to Austin to meet with Slie, who asked him repeatedly if Plaintiff knew why Plaintiff was there; Plaintiff professed ignorance. *See* ECF No. 71-11 at 2. Slie left the room, then returned and repeatedly asked whether Plaintiff "had been counseled"; Plaintiff said he had not, after which Slie again left the room. *Id.* Slie returned and again asked Plaintiff if he had been counseled; Plaintiff again replied that he had not. *See id.* at 3. Slie said that he had been informed Plaintiff had been counseled numerous times "for behavior problems and failing to produce a work product." *Id.* Plaintiff then described a meeting in Denton, Texas on June 1, 2016, with two supervisors who assured Plaintiff that he was "need[ed]" and encouraged him to "learn the Public Assistance Program in baby steps." *Id.* Slie then stated that he had received "numerous phone calls and emails" concerning Plaintiff's comment about Kemler getting four flat tires. *See id.* According to Plaintiff, Slie "then stated, 'I have known these people for nine years and I have never known them to lie to me. I do not think that there is a conspiracy against you. You are done here." *Id.* Plaintiff "interrupted [Slie] by saying, 'In all fairness to me and this process, don't I get an opportunity to

defend myself and make a statement?'"[14] *Id.* at 4. Slie said that Plaintiff would not be afforded that opportunity, instead Plaintiff would be "leaving this disaster. We are done here. Pack your stuff. You are out of here." *Id.* Slie instructed Plaintiff to retrieve his work laptop, scanner, and printer from his car to return to the property officer. *See id.* Only after he had collected his work hardware did Plaintiff tell Slie that he "wanted to speak with an Employee Resource Officer." *Id.* Slie then led Plaintiff to the Office of Equal Rights, where Plaintiff initiated informal counseling. ECF No. 74-1, ¶¶ 3–4.

Thus, the evidence in the record shows that Plaintiff's demobilization was in the works since, at the latest, June 9, 2016, when Schulte ordered Plaintiff to pass off his work to a colleague, leave the disaster site, and report to headquarters Austin—the day *before* Plaintiff met with Slie and thereafter asked to speak to an EEO counselor, which is the relevant protected activity. *See, e.g.*, *Terveer*, 34 F. Supp. 3d at 119 ("[A]n adverse employment action that was already contemplated before a plaintiff engaged in protected activity cannot be evidence of retaliation."). And Plaintiff's own description establishes that he was actually demobilized before that request. Accordingly, the demobilization cannot have been in retaliation for Plaintiff's protected activity. *See, e.g.*, *Barnes*, 2025 WL 915564, at *4 ("[T]he fact that the alleged retaliatory actions preceded the protected activity precludes a determination that the protected activity caused the defendant to retaliate against the plaintiff." (quoting *Lewis*, 653 F. Supp. 2d at 79).

[14] At one point in his brief, Plaintiff seems to imply that his request to Slie during the meeting "for a fair opportunity 'to defend myself and make a statement'" constituted protected activity. ECF No. 73 at 13 (quoting ECF No. 71-11 at 4). If that is his position, he is mistaken. To garner protection under Title VII, an informal complaint to a supervisor "must in some way allege unlawful discrimination—that is, discrimination on the basis of a protected characteristic." *Dodson v. U.S. Capitol Police*, 633 F. Supp. 3d 235, 261 (D.D.C. 2022) (quoting *Brady v. U.S. Capitol Police*, 200 F. Supp. 3d 208, 214 (D.D.C. 2016)). The statement Plaintiff offers does not do so.

**B. Termination**

The legitimate, non-retaliatory reasons FEMA proffers for Plaintiff's termination on July 8, 2016 (approximately one month after his meeting with Slie and subsequent contact with an EEO counselor) are the four specifications in Kent's July 8, 2016, termination letter. The D.C. Circuit has recognized several ways that a plaintiff may "support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, such as

> by citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.

*Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). Here, Plaintiff claims that a reasonable jury could find that FEMA's explanation was dishonest. *See, e.g.*, ECF No. 73 at 10–13. The relevant question when a plaintiff "attempt[s] to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision" is not "whether the underlying . . . incident[s] occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying . . . incident[s] occurred." *Brady*, 520 F.3d at 495–96; *see also, e.g.*, *Kama v. Mayorkas*, 107 F.4th 1054, 1063 (9th Cir. 2024) ("[E]ven if there were a genuine dispute as to Plaintiff's [conduct], an employer's 'objectively false' or 'baseless' reason for taking adverse action does not establish pretext, so long as the employer 'honestly believed its reasons for its actions.'" (quoting *Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1063 (9th Cir. 2002))). Importantly, a retaliation plaintiff ordinarily "must show that *the decisionmaker*" did the retaliating. *Onyebuchi v. Howard Univ. Hosp.*, 731 F. Supp. 3d 1, 8 (D.D.C. 2024) (emphasis in original). "More, 'to defeat FEMA's summary judgment motion,' Plaintiff 'must demonstrate pretext as to all of FEMA's proffered neutral explanations, not just some of them.'" *Hartzler*

*v. Mayorkas*, No. 20-cv-3802, 2022 WL 15419995, at *34 (D.D.C. Oct. 27, 2022) (citation modified) (quoting *Hairston v. Boardman*, 915 F. Supp. 2d 155, 161 (D.D.C. 2013)), *aff'd*, No. 22-5310, 2024 WL 3219489 (D.C. Cir. June 28, 2024). So, to survive Defendant's summary judgment motion, Plaintiff must point to sufficient evidence for a reasonable jury to find that the decisionmaker who terminated him—here, Kent—did not do so because any of the conduct outlined in the four proffered specifications, but, rather, that she terminated him for seeking EEO counseling. *See, e.g.*, *Brady*, 520 F.3d at 494. That is a heavy burden.

Plaintiff does not shoulder it. As noted, the relevant question is whether *Kent* retaliated against Plaintiff when she decided to terminate him. But Plaintiff has failed to show why Kent would want to retaliate against him. To be sure, Slie informed Kent of Plaintiff's protected activity—specifically, that Plaintiff asked to speak to personnel in the Office of Equal Rights on June 10, 2016, after he had been informed of his demobilization—in a phone conversation and follow-up email on June 10, which predated Kent's termination decision. *See* ECF No. 71-7. However, showing that the decisionmaker had knowledge of protected activity alone "is utterly insufficient to sustain a plaintiff's burden on summary judgment." *Mera v. Garland*, No. 20-cv-2127, 2024 WL 1253856, at *20 (D.D.C. Mar. 25, 2024), *aff'd sub nom. Mera v. Bondi*, No. 24-5125, 2025 WL 1418164 (D.C. Cir. May 16, 2025); *see also, e.g.*, *Knight v. Fla. Dep't of Transp.*, 291 F. App'x 955, 960 (11th Cir. 2008) ("[The decisionmaker's] knowledge that [the plaintiff] engaged in protected activity is not evidence sufficient on its own to show the actual motivation for the termination was retaliatory."); *cf. Tyes-Williams v. Garland*, No. 17-cv-1191, 2021 WL 4262631, at *4 (D.D.C. Sep. 20, 2021) ("[A] decisionmaker's knowledge of an applicant's race does not suggest—let alone prove—that he discriminated against the applicant."). More, courts have found that an individual who has not been accused of wrongdoing is unlikely to retaliate. *See, e.g.*,

*Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) ("[N]o rational juror could conclude that if Kasunic assaulted Wright, it was in retaliation for Wright's having written, some 10 weeks earlier, a letter that did not name Kasunic or any other officers and complained of an incident in which Kasunic was not a participant."); *Iacob v. Las Vegas Metro. Police Dep't*, No. 14-cv-923, 2017 WL 553388, at *7 (D. Nev. Feb. 10, 2017) (finding that a supervisor who was not named in the plaintiff's complaint of discrimination was unlikely to retaliate), *aff'd*, 703 F. App'x 550 (9th Cir. 2017); *Patterson v. Apple Computer, Inc.*, No. C 04-0405, 2005 WL 2277005, at *21 (N.D. Cal. Sep. 19, 2005) (finding that an individual who was "not named by plaintiff in any administrative charge or complaint" until after the alleged retaliatory act "would have had no reason to retaliate against plaintiff"), *aff'd*, 256 F. App'x 165 (9th Cir. 2007). Until he was terminated on July 8, 2016, Plaintiff would have had no reason to accuse Kent of unlawful discrimination and, as noted in Section I, *supra*, the initial EEO Counselor's Report in the record—dated July 19, 2016—shows that Plaintiff complained about discrimination at the hands of Slie, Kemler, and Smith, but not Kent. *See* ECF No. 73-4 at 2 ("On June 10, 2016, Complainant filed a complaint stating he believed he was discriminated against based on his Race and Sex due to his treatment [by Slie] upon arrival at the Austin, TX JFO on this same date and other experiences during his deployment."), 5 ("Complainant believes he was discriminated against because he was verbally humiliated continually by [Kemler] and falsely accused by [Smith] of making threats to do physical harm to individuals on his team and making a comment about how flat tires might be a method by which to increase the time frame the Team had to complete a project."), 13. And even if Plaintiff later accused Kent of discrimination—he has not pointed to evidence that he did so—he does not identify any decision Kent made after such a complaint constituting an employment action that "'could well dissuade a reasonable worker' from engaging in the protected activity," which is the standard

that applies to Title VII retaliation claims. *Kayode v. Blanche*, No. 25-5076, 2026 WL 1223991, at *3 (D.C. Cir. May 5, 2026) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006)), let alone one that was allegedly retaliatory.

Plaintiff suggests that Slie's behavior at the June 10, 2016, meeting in Austin "supports a jury question on retaliatory motive and pretext" because there is "evidence of hostility surrounding [Plaintiff's] request for Equal Rights assistance." ECF No. 73 at 13. But Slie did not terminate Plaintiff—Kent did. To be sure, a plaintiff may argue that a non-decisionmaker's retaliatory animus should be imputed to the decisionmaker via the "cat's paw" theory approved by the Supreme Court in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). Under that framework, the plaintiff must show that the non-decisionmaker "perform[ed] an act motivated by [retaliatory] animus that [he] intended . . . to cause an adverse employment action" and "that act [was the] proximate cause of the ultimate employment action."[15] *Id.* at 422 (emphasis omitted).

Plaintiff here makes no attempt to pursue a cat's paw theory: His briefing neither mentions the term nor cites, let alone discusses, *Staub* or any other case addressing the theory. "[O]ur system

[15] A number of Courts of Appeal have held that, because a retaliation claim requires but-for causation, *see Nassar*, 570 U.S. at 352, the *Staub* rule must be "tailor[ed]" to reflect that "the retaliatory actions of non-decisionmakers" must be more than a mere "motivating factor" in the adverse employment action; rather, "factors that were tainted by retaliation" must be the but-for cause of the decision. *Seoane-Vasquez v. Ohio State Univ.*, 577 F. App'x 418, 428 (6th Cir. 2014); *see also Byrnes v. St. Catherine Hosp.*, 158 F.4th 1107, 1118 n.4 (10th Cir. 2025) ("To establish causation where a Title VII retaliation claim is based on the cat's-paw theory, a plaintiff must demonstrate that the biased subordinate was a 'but-for' cause of the adverse action." (citation modified) (quoting *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 516 n.8 (10th Cir. 2015))); *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 699 F. App'x 146, 155 n.11 (4th Cir. 2017) ("[W]hile *Staub* permitted a plaintiff to prevail under a cat's paw theory of liability where the supervisor's action was only '*a* causal factor' in the analysis, a Title VII retaliation plaintiff would have to show that but for the supervisor's conduct, the adverse employment action would not have occurred." (citation omitted) (quoting *Staub*, 526 U.S. at 420–21)); *Spratt v. Verizon Commc'ns*, 633 F. App'x 72, 73 (2d Cir. 2016) (stating, in a retaliation case based on a "'cat's paw' theory of liability" that the nondecisionmaker's "retaliatory actions must be the 'but-for' cause of the employer's adverse employment action"). Put another way, the non-decisionmaker's "influence with the decisionmaker [must] be strong enough to actually cause the adverse employment action." *Acosta v. Brain*, 910 F.3d 502, 515 (9th Cir. 2018) (quoting *Zamora v. City of Houston*, 798 F.3d 326, 332 (5th Cir. 2015)). The D.C. Circuit does not appear to have weighed in on the question. In any case, "since the facts in this case do not establish that any retaliatory intent harbored by [Slie] was even a cause underlying the decision to [fire Plainitff], the Court does . . . not premise its decision on the absence of the 'but for' proof." *Duncan v. Johnson*, 213 F. Supp. 3d 161, 191 n.21 (D.D.C. 2016).

'is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020) (citation modified) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)). Courts "apply forfeiture to unarticulated legal and evidentiary theories not only because judges are not like pigs, hunting for truffles buried in briefs or the record, but also because such a rule ensures fairness to both parties." *Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016) (citation modified) (quoting *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 137 (D.C. Cir. 2011)). Plaintiff has forfeited any argument based on a cat's paw theory. *See, e.g.*, *Arnoldi v. Bd. of Trs., Nat'l Gallery of Art*, 557 F. Supp. 3d 105, 119 (D.D.C. 2021) (ruling that the plaintiff had forfeited any argument advancing a cat's paw theory by failing to raise it).

In any event, from the evidence before the Court, any such argument would not succeed. First, evidence that Slie had a retaliatory motive is flimsy. His conduct preceding Plaintiff's request to speak to personnel at the Office of Equal Rights—which includes Slie's first alleged threat to terminate Plaintiff in Austin on June 10, 2016, *see* ECF No. 71-11 at 4—cannot itself be retaliatory because it came before any protected activity. *See* Section III.A, *supra*. And any later threat Slie made to terminate Plaintiff—the EEO Counselor's Report asserts that Slie stated to one of the EEO counselors that he would ensure Plaintiff was fired, *see* ECF No. 73-4 at 7—can hardly be considered evidence of retaliation when Slie had already made a similar threat before Plaintiff engaged in any protected activity. *See, e.g.*, *Richards v. Dep't of Educ. of City of N.Y.*, No. 21-cv-338, 2022 WL 329226, at *17 (S.D.N.Y. Feb. 2, 2022) (finding the fact that the plaintiff endured similar conduct before engaging in protected activity "belies" a retaliatory motive); *Murdy v. Kempthorne*, No. 07-cv-1008, 2008 WL 5209981, at *10 (D.S.D. Dec. 9, 2008) (finding no

evidence of causation where the plaintiff's supervisor "merely . . . continued his alleged previous 'hostile' behavior after [the] plaintiff participated in the EEO process"); *Wright v. N.Y.C. Off-Track Betting Corp.*, No. 05-cv-9790, 2008 WL 762196, at *5 (S.D.N.Y. Mar. 24, 2008) ("If an employer's conduct before and after an employee complaint is consistent, the post-complaint conduct is not retaliatory."); *cf. Terveer*, 34 F. Supp. 3d at 119 ("[A]n adverse employment action that was already contemplated before a plaintiff engaged in protected activity cannot be evidence of retaliation."). Similarly, Plaintiff asserts that Slie told the EEO counselors, "[T]his man wants to talk to you, and everything that he's going to say is a lie." ECF No. 73 at 14 (quoting ECF No. 71-3 at 26). That echoes Slie's statements made prior to Plaintiff's invocation of the EEO process indicating that, based on Slie's conversations with Plaintiff's supervisors, Plaintiff was lying about his conduct. *See* ECF No. 71-11 at 3 (Plaintiff noting that Slie questioned the truthfulness of Plaintiff's assertions that he had not engaged in the charged misconduct and that he had not been counseled about it because Schulte, Kemler, and other FEMA personnel contradicted Plaintiff's account). It is not a reasonable inference that Slie's statements, which exhibit the same hostility to Plaintiff both before and after Plaintiff sought EEO counseling, demonstrate that Slie was motivated to retaliate against Plaintiff because of Plaintiff's protected activity.

Second, even if Plaintiff had shown that Slie harbored a retaliatory motive, there is insufficient proof for a reasonable factfinder to determine that Slie's motive "infected" Kent's decision to fire Plaintiff. *Hampton v. Vilsack*, 685 F.3d 1096, 1101 (D.C. Cir. 2012). To do so, there would have to be some evidence from which a reasonable juror could infer that Slie "materially influenced [Kent's] decision to terminate Plaintiff." *Parker v. Nat'l R.R. Passenger Corp.*, 214 F. Supp. 3d 19, 26 (D.D.C. 2016). But Plaintiff has not argued that, for example, a "biased report" by Slie caused Kent to terminate him. *Staub*, 562 U.S. at 421. And there is no evidence in the record that

Slie even recommended to Kent that she terminate Plaintiff. *See, e.g.*, *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (finding that the non-decisionmaker "clearly intended to cause" the plaintiff's suspension where the non-decisionmaker recommended suspending the plaintiff). Rather, the EEO Counselor's Report reflects that, although at one point Slie said to her that he wanted Plaintiff fired (again, there is no evidence he ever made such a statement to Kent), he later recanted and asserted he did *not* want that, but instead thought Plaintiff should "receive[] additional job skills training and training in the area of interpersonal skills." ECF No. 73-4 at 7, 10. Instead, the record reflects that Kent engaged in her own investigation by collecting and reviewing evidence, including evidence from Plaintiff, and determining (as discussed below) that Plaintiff had engaged in inappropriate conduct and should be terminated. *See, e.g.*, *Hampton*, 685 F.3d at 1101 (rejecting cat's paw liability where the allegedly biased supervisor did not assist the decisionmaker in investigating the plaintiff's misconduct or preparing the report of the investigation, but merely provided the decisionmaker with documents, and the decisionmaker "conducted an independent review of the evidence"); *Román v. Castro*, 149 F. Supp. 3d 157, 173 (D.D.C. 2016) (finding no cat's paw liability where the decisionmaker "did not fail to consider one side's version of the events and rely solely on the other's"); *cf. Griffin v. Wash. Convention Ctr.*, 142 F.3d 1308, 1311 (D.C. Cir. 1998) (finding that, where the allegedly biased non-decisionmaker was the decisionmaker's "chief source of information" regarding the plaintiff's performance, "repeatedly urged" the decisionmaker to fire the plaintiff, was made responsible for evaluating the plaintiff's performance, and "was in contact with [the decisionmaker] at every significant step in the decisionmaking process," a reasonable jury "might well conclude" that the non-decisionmaker's bias infected that process). That is, "this is not a case in which the deciding official was 'dependent upon a biased subordinate's opinion' or was 'unable independently to assess' the basis for

sanctioning an employee." *Hampton*, 685 F.3d at 1101 (citation modified) (quoting *Griffin*, 142 F.3d at 1311). Accordingly, the evidence in the record before the Court does not support a finding that Slie proximately caused Plaintiff's termination under a cat's paw theory.

Plaintiff's primary argument targeting Kent for retaliation with respect to his termination relies on chronology:

> The timing and content of FEMA's own documents would allow a reasonable jury to conclude that crucial supporting material was assembled after Plaintiff's demobilization and after he invoked Equal Rights [by asking to speak to an EEO counselor on June 10, 2016]. Kent admitted she did not seek substantiating documents until June 13 and received them only after Plaintiff had already been released from the field. Her June 13 email shows that she was still asking whether alleged prior counseling had ever been memorialized and still requesting additional witness statements. Her June 20 email to Kemler likewise states that she was "reviewing the information submitted to me by field leadership regarding the many instances of performance and conduct issues" and asks Kemler to provide the June 8 document she had supposedly sent earlier.
>
> Kent's June 13 statement of record is especially telling. It does not describe a process that had already concluded before June 10. Instead, after reciting Plaintiff's version of events and the allegations reported up the chain, Kent wrote that "[u]pon receipt of the information I will review the field documents as well as personal account from [Plaintiff] and consult with Patricia Silva on appropriate actions." The counseling report is consistent: it states that solicited documents, "along with an evaluation done after Complainant de-mobbed," were later submitted as proof that Plaintiff had been counseled. A reasonable jury could view this sequence not as a neutral discipline process that predated protected activity, but as after-the-fact record-building to justify a severe outcome once Plaintiff had sought Equal Rights assistance.

ECF No. 73 at 10 (internal citations omitted) (first citing ECF No. 71-5 at 6; then quoting ECF No. 73-5 at 1; then quoting ECF No. 71-12 at 2; then quoting ECF No. 71-10 at 2; and then quoting ECF No. 73-4 at 3). Later in his opposition brief, Plaintiff similarly maintains that from those facts a reasonable factfinder could "conclude that Defendant did not terminate Plaintiff because FEMA had already completed a neutral disciplinary review before June 10. It could instead conclude that the July 8 termination was the product of a record that was still being gathered, framed, and amplified only after Plaintiff invoked Equal Rights on June 10." *Id.* at 24. That is, Plaintiff

contends that because Kent did not begin gathering documentation until after she knew that Plaintiff had engaged in protected activity, a reasonable factfinder could determine that the investigation was a ruse designed to fabricate reasons to fire him. It is a losing argument.

Rather than supporting Plaintiff's theory of pretext, the chronology undermines it. It shows that supervisors, having become concerned about Plaintiff's conduct, demobilized him on June 10, 2016, prior to his protected activity and later terminated him based on that conduct. "Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation." *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005); *see also, e.g.*, *Kania v. Flint Grp.*, No. 21-cv-1845, 2023 WL 4546428, at *7 (D. Minn. July 14, 2023) (finding no evidence of retaliation where the plaintiff's employer began having concerns about his performance and placed him on a performance improvement plan prior to his protected activity and thereafter fired him).

Plaintiff leans hard on Kent's "admi[ssion]" that she did not receive materials supporting Plaintiff's termination before June 10, citing it throughout his opposition brief. ECF No. 73 at 2 ("Kent later admitted that, before June 10, she had received no information regarding 'conduct issues or verbal threats' involving Plaintiff and that she did not require substantiating documents until after her June 13 call with him." (quoting ECF No. 71-5 at 6)), 10 ("Kent admitted she did not seek substantiating documents until June 13 and received them only after Plaintiff had already been released from the field."), 20–21 ("Kent later admitted that she did not require substantiating documents until Plaintiff called her on June 13, that all supporting documents were received only after his release, and that she had 'received no information prior to June 10, 2016 regarding conduct issues or verbal threats involving [Plaintiff].'" (quoting ECF No. 71-5 at 6)), 23 ("Kent later admitted she had received no information about conduct issues before June 10 and did not begin

requiring substantiating documents until June 13."). That statement cannot bear the pressure Plaintiff puts on it. To be sure, it establishes that Kent knew of Plaintiff's protected activity when she began gathering evidence but, as already noted, that does not get Plaintiff very far. *See, e.g.*, *Mera*, 2024 WL 1253856, at *20 ("Alleging, and assuming as true, that an employer had knowledge of a plaintiff's [protected activity] is utterly insufficient to sustain a plaintiff's burden on summary judgment."). And the so-called admission is hardly surprising. There is no evidence that Kent had any involvement in the demobilization so there is no reason that she should have collected documentation of Plaintiff's alleged inappropriate conduct prior to that event. Indeed, nothing in the record before the Court suggests that Kent knew of the demobilization before it occurred. According to Slie, he was ordered to demobilize Plaintiff by Doran, the Federal Coordinating Officer, not by Kent. *See* ECF No. 73-2 at 19. Rather, it appears that Kent first became aware of Plaintiff's demobilization on June 10, 2016, *after* it had occurred: Slie sent Kent an email that evening thanking her for her "time and guidance during [their] conversation [that] afternoon" that "recap[ped]" what Slie had told Kent on the phone, including the details of Slie's meeting with Plaintiff and Plaintiff's consultation with the Office of Equal Rights. ECF No. 73-5 at 2. Slie's email notes that he had his discussion with Kent after Plaintiff had requested that consultation. *See id.* ("[Plaintiff] turned his gear into [the property office] and then went to the [Equal Rights] office. From what was reported by HR—[Kent], Kathy Davis, and [Slie] were in discussion at the time—he was escorted by [personnel from the Equal Rights Office] through the facility to the required check-out sections and then escorted to his vehicle[.]"). That is, Slie's email indicates that his phone conversation with Kent occurred after the conclusion of Slie's meeting with Plaintiff and Plaintiff's request to visit the Office of Equal Rights. For her part, Kent asserted that Plaintiff's meeting with Slie, where he was demobilized at the direction of Doran, "happened prior to the cadre having

knowledge of any . . . proposal for his demobilization." ECF No. 73-2 at 21. Kent also states that she sought "substantiating documents" in response to her conversation with Plaintiff on June 13, 2016, when he "brought to [her] attention" his concerns about his demobilization, ECF No. 71-5 at 6; *see also* ECF No. 71-10 at 2. Thus, the record reflects that Kent began to collect documentary evidence related to Plaintiff's alleged misconduct promptly after Plaintiff informed her of his concerns that he "was not treated fairly." *See* ECF No. 71-10 at 2. There is nothing suspicious, let alone nefarious, about that. And there is nothing on which to base an inference of retaliation.

Critically, too, the evidence Kent received after Plaintiff's demobilization and protected activity included documentation corroborating much of the conduct relied on in Plaintiff's notice of termination. Smith's email of June 8, 2016, alleged that Plaintiff stated he hoped Kemler would get four flat tires; that he referred to other team members as "old man" and "Kid"; that he called Smith "stupid"; and that he asserted that he would "cut" another team member, which Smith interpreted as a threat. ECF No. 71-9 at 2. Schneider's June 8, 2016, report recounted that Plaintiff made the statement about Kemler getting four flat tires, which he characterized as a "wish[] of harm to [Kemler]"; that Plaintiff had "made gestures of 'I'll stab you with this plastic fork'" to a hotel guest; and that Plaintiff had stated he would stab Schneider. ECF No. 71-8 at 3–4. Schneider concluded that, although Plaintiff's "bark may be bigger than his bite," federal employees "are held to a higher standard." *Id.* at 4. In an incident report of June 13, 2016, Kent reported that, in their telephone call of the same date, Plaintiff admitted that he made comments about his supervisor getting four flat tires and about stabbing a co-worker with a plastic fork. *See* ECF No. 71-10 at 2. Evidence post-dating Kent's termination decision provides further corroboration. In his letter appealing that decision, Plaintiff acknowledged that he made a comment about Kemler getting four flat tires, that he had asked staff at a hotel he scouted about vehicles being burglarized (which

is the basis of the charge that he performed an unauthorized security check), and that he might have called colleagues "old man" and "kid" and might have used the term "stupid." *See* ECF No. 71-6 at 4, 7, 10. A 2019 affidavit from one of Plaintiff's colleagues during the relevant period—Guy Tervene—recalls that Plaintiff joked about stabbing with a plastic fork, which made others "concerned" and "offended." ECF No. 73-3 at 4, 16–17.

The Court cites this evidence not to establish that the conduct actually occurred—Plaintiff is correct that there is an issue of fact as to at least some of the infractions. *See* ECF No. 73 at 10–13. But the pertinent question is not "whether the underlying . . . incident[s] occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying . . . incident[s] occurred." *Brady*, 520 F.3d at 496. And "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Id.* at 495. "'[T]he core inquiry' on summary judgment is 'whether Plaintiff has produced sufficient evidence for a reason[able jury] to find that FEMA did not "honestly believe in the reasons it offered"' for [terminating] Plaintiff' on July 8, 2016. *Wilson v. Noem*, No. 20-cv-100, 2025 WL 1000666, at *31 (D.D.C. Apr. 3, 2025) (citation modified) (quoting *Hartzler*, 2022 WL 15419995, at *19). He has not done so. To the contrary, the evidence in the record before the Court supports the conclusion that Kent honestly and reasonably believed that the misconduct on which his termination was based occurred, and, most importantly at this stage, Plaintiff has pointed to no evidence that suggests she did not. *See Nasser*, 962 F. Supp. 2d at 242 ("Summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." (citation modified) (quoting *Springer*, 518 F.3d at 484)). In

arguing that issues of fact as to whether the "incident[s] occurred" preclude summary judgment, he focuses on the wrong question. *Brady*, 520 F.3d at 496.

Likewise, Plaintiff's insistence that, if he did say what FEMA says he said, his termination was overkill because he was only joking, *see, e.g.*, ECF No. 73 at 3 ("A reasonable jury could . . . find that FEMA characterized disputed jokes as threats . . . ."), does not save his claim. "[T]he Court is not authorized to consider the wisdom of an employer's employment decision, only whether the employer honestly and reasonably believed that its decision was correct[.]" *Vasquez-Mills v. District of Columbia*, 278 F. Supp. 3d 167, 180 (D.D.C. 2017); *see also, e.g.*, *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir. 2001) ("[I]t is not sufficient for the employee to show that his employer fired him for incorrect or poorly considered reasons. He must establish that the employer did not honestly believe the reasons it gave for terminating him." (quoting *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 718 (7th Cir. 1999))); *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("[T]he issue is 'not the correctness or desirability of the reasons offered . . . .'" (citation modified) (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992))). Again, Plaintiff points to no evidence that Kent did not believe that the conduct cited in the notice of termination merited his removal from FEMA. That alone dooms his argument. *See Wilson*, 2025 WL 1000666, at *31 ("'[T]he core inquiry' on summary judgment is 'whether Plaintiff has produced sufficient evidence for a reason[able jury] to find that FEMA did not "honestly believe in the reasons it offered"' for [terminating] Plaintiff . . . ." (citation modified) (quoting *Hartzler*, 2022 WL 15419995, at *19)). The Court nevertheless notes that evidence in the record supports the conclusion that Kent *did* honestly and reasonably believe Plaintiff's conduct was sufficiently serious to warrant termination. She asserted that in her June 13, 2016, call with Plaintiff she related that his comments about flat tires and stabbing had been

interpreted as threats, "which made his peers feel scared and uncomfortable in his company" notwithstanding that he "meant no harm"; she also informed him "that type of behavior is not acceptable nor condoned." ECF No. 71-10 at 2. During the EEO investigation, Kent informed the counselor that "there is zero tolerance for threats regardless of whether or not they are jokes because how and when do you know it's really a joke[?]" ECF No. 73-4 at 11. Schneider interpreted Plaintiff's "four flat tires" comment to be a "wish[] of harm" to Kemler. ECF No. 71-8 at 3. And Smith reported that Plaintiff was "negative, aggressive, unprofessional[,] and insecure," and that he made her uncomfortable. ECF No. 71-9 at 2. That is, although Plaintiff downplays his comments as jokes, evidence in the record shows that Kent (and others) nevertheless considered them inappropriate and sanctionable.[16] Again—and critically at this stage—Plaintiff has not pointed to evidence from which a reasonable jury could conclude otherwise. *See Nasser*, 962 F. Supp. 2d at 242 ("Summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." (citation modified) (quoting *Springer*, 518 F.3d at 484)).

There is one statement in the notice of termination that all now agree is inaccurate. Defendant acknowledges that Plaintiff did not state that he hoped Kemler's four flat tires would cause her to get into a car accident. *See* ECF No. 74-1, ¶ 14. That admission is not enough to get

[16] Plaintiff cites *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285 (7th Cir. 1999), to suggest that a jury could find FEMA's assertion that Plaintiff was fired for misconduct to be pretextual because the punishment did not fit the crime. *See* ECF No. 73 at 12. In that case, the employee had been fired for theft after he ate some chips that "were left in an open bag on the countertop of the break room" without objection from the owner of the chips. *Stalter*, 195 F.3d at 290. The appellate court characterized the severity of the punishment as "swatting a fly with a sledge hammer," stating that the employer's asserted belief that it had to terminate the employee for the offense "d[id] not pass the straight-face test." *Id.* Plaintiff's alleged conduct here is of a different caliber than the conduct in *Stalter* not least because (1) there are four instances of misconduct rather than one, (2) among those instances are threats of violence, and (3) some colleagues found the behavior troubling. More, the Seventh Circuit did not find that the severity of the punishment alone created an issue of fact as to pretext. Rather, the court considered the punishment "in light of two additional facts": (1) the employer "did not terminate a Caucasian employee who also committed gross misconduct" and (2) the employer's contention that termination was mandatory for gross misconduct was belied by its own policy, which made termination a *potential* punishment. *Id.* at 290–91. There has been no such showing here.

Plaintiff's claim to a jury, however. Again, the pertinent question is what Kent believed. *See, e.g.*, *Kama*, 107 F.4th at 1063 ("[A]n employer's 'objectively false' or 'baseless' reason for taking adverse action does not establish pretext, so long as the employer 'honestly believed its reasons for its actions.'" (quoting *Villiarimo*, 281 F.3d at 1063)). Plaintiff has not shown that Kent fabricated that statement. Indeed, he appears to acknowledge that there was evidence that he made the statement, noting that "the formal charge letter . . . included more inflammatory language than *some* of the contemporaneous statements." ECF No. 73 at 23 (emphasis added). And it is not farfetched that Kent would believe Plaintiff had made such a statement based on the record before her. Getting four flat tires would likely lead to a car accident and Schneider reported that Plaintiff's comment "wish[ed] . . . harm" to Kemler. ECF No. 71-8 at 3. More, even if Plaintiff had pointed to "sufficient evidence for a reason[able jury] to find" that Kent did not "honestly believe" that Plaintiff had made such a comment, *Wilson*, 2025 WL 1000666, at *31 (quoting *Hartzler*, 2022 WL 15419995, at *19), that still leaves unrebutted Kent's belief in the other three specifications in the notice of termination. Generally, to defeat a retaliation defendant's motion for summary judgment, a plaintiff "must demonstrate pretext as to all of [the employer's] proffered neutral explanations, not just some of them." *Hartzler*, 2022 WL 15419995, at *34 (quoting *Hairston*, 915 F. Supp. 2d at 161). Plaintiff has not done so here.

In sum, Plaintiff has not shown that there is a genuine issue of material fact as to whether Defendant's reasons for firing him were pretextual.

**C. Rescission of Tentative Job Offer**

That leaves Plaintiff's argument that Hayes' July 22, 2016, decision to rescind the tentative job offer constituted illegal retaliation. As noted, a retaliation plaintiff ordinarily "must show that *the decisionmaker*"—in this instance, Hayes—did the retaliating. *Onyebuchi*, 731 F. Supp. 3d at

8. But Plaintiff points to no evidence that Hayes (or anyone else who communicated about the rescission of the tentative job offer, that is, Meissinger, Silva, Willard, Edwards, and McEvoy) knew of Plaintiff's protected activity prior to the decision to withdraw the job offer on July 22, 2016. "You can't retaliate against something you don't know exists." *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1337 (11th Cir. 2021). Plaintiff points to no evidence that Hayes (or the others) had any motive to retaliate against Plaintiff. *See Patterson*, 2005 WL 2277005, at *21 (finding that an individual who was "not named by plaintiff in any administrative charge or complaint" until after the alleged retaliatory act "would have had no reason to retaliate against plaintiff"). And Plaintiff points to no evidence that Hayes (or the others) did not "honestly and reasonably believe" that Plaintiff was being terminated from FEMA for inappropriate conduct.[17] *Brady*, 520 F.3d at 496. That is, Plaintiff does not attempt to show that the decisionmaker—or anyone even tangentially involved in the decision to rescind the tentative job offer—was motivated by retaliatory animus. His claim therefore fails under any conventional understanding of the standards required to defeat summary judgment on a retaliation claim.

Instead, Plaintiff proffers that his claim that the rescission was retaliatory is "derivative of" his claim that his termination was retaliatory. ECF No. 73 at 18. His theory is that, because the decision not to hire Plaintiff was based on the decision to terminate him, the "rescission rises or

[17] Plaintiff notes that Hayes instructed Meissinger to rescind the tentative job offer on July 22, 2016, and she officially rescinded it on July 25, 2016, but Plaintiff was not informed that the appeal of his termination was denied until July 27, 2016; this, he says supports his argument "that the hiring side acted on a contested removal narrative that was still in flux." ECF No. 73 at 18; *see also* ECF No. 71-14 at 2 (email from Hayes to Meissinger on July 22 instructing her to "cancel" the hiring action because of "the circumstances of the termination (inappropriate conduct while on deployment)"); ECF No. 71-19 at 2 (email from Meissinger to Plaintiff on July 25 rescinding the job offer); ECF No. 71-13 at 2 (letter of July 27 denying Plaintiff's appeal of his termination). If this is Plaintiff's attempt to establish that Hayes did not honestly and reasonably believe that Plaintiff was being terminated, it is both unclear and anemic. There is no indication in the record before the Court that Hayes knew Plaintiff had appealed his termination. Indeed, the only communication about the appeal involving those who took part in discussions about rescinding the tentative job offer is a July 21, 2016, email from Willard to Meissinger asserting that Plaintiff's appeal would be denied and Plaintiff would be notified "shortly." ECF No. 71-17 at 2. That is, the record indicates that the decision to deny Plaintiff's appeal pre-dated the withdrawal of the job offer.

falls with the termination rationale on which it was expressly based." *Id.* at 16. Of course, that argument fails on its own terms because, as discussed in Section III.B, *supra*, Plaintiff's retaliation claim based on his termination is unsustainable. But Defendant is entitled to summary judgment on this claim of retaliatory rescission for a more fundamental reason: Plaintiff's briefing utterly fails to support the theory of liability he advances.

"[A] litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (quoting *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988)). It is not the job of the federal courts to develop parties' arguments: "That is for *them* to do." *United States v. Vásquez Rijos*, 119 F.4th 94, 112 n.12 (1st Cir. 2024). Accordingly, "undeveloped arguments[] and arguments that are unsupported by pertinent authority" are forfeited. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

Plaintiff maintains that he

> does not need, at summary judgment, to litigate a free-standing defect in FEMA's suitability process to survive on this retaliation claim. The narrower point is enough: the Security Cadre withdrew the [tentative job offer] because of the same disputed termination narrative that a reasonable jury could find retaliatory or pretextual. If the underlying termination rationale is triably tainted, the derivative [tentative job offer] rescission is triably tainted as well.

ECF No. 73 at 19. As support, he cites *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 147–48 (2000), and *Hernandez v. Pritzker*, 741 F.3d 129, 133 (D.C. Cir. 2014). ECF No. 73 at 19. The *Reeves* pincite points to the Court's discussion of pretext—specifically, that "[i]n appropriate circumstances," a factfinder may "reasonably infer from the falsity of the [employer's legitimate, non-discriminatory] explanation that the employer is dissembling to cover up a discriminatory purpose." 530 U.S. at 147. The *Hernandez* pincite leads to the D.C. Circuit's overview of the "framework of *McDonnell Douglas Corp. v. Green*, as simplified by *Brady v. Office of*

*Sergeant at Arms* and *Jones v. Bernanke*." *Hernandez*, 741 F.3d at 133 (citations omitted). Plaintiff offers no further authority to back up his position. That is, he provides *no* support for his theory that the taint from a prior adverse employment action can be carried over to support a *separate claim* of retaliation related to a later adverse employment action that was not itself retaliatory and was taken by a different decisionmaker.

Instead, Plaintiff presents his theory as axiomatic, a mere application of causal transitivity: If illegal retaliation caused his termination and his termination caused the job offer to be rescinded, then illegal retaliation caused the job offer to be rescinded. It is not so simple. "[R]etaliation is a form of intentional discrimination because 'retaliation is, by definition, an intentional act.'" *Palmquist v. Shinseki*, 808 F. Supp 2d 322, 341 (D. Me. 2011) (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005)). Here, as noted above, there is no evidence that Hayes (or anyone else, for that matter) intentionally retaliated against Plaintiff.

Of course, courts have recognized a principle by which the retaliatory intent of one actor can be imputed to another—the cat's paw theory. As noted, to succeed on that theory, a plaintiff must show that a non-decisionmaker (1) "perform[ed] an act motivated by [retaliatory] animus" (2) that he or she "*intended* . . . to cause an adverse employment action" and (3) that was "a proximate cause of the ultimate employment action." *Staub*, 562 U.S. at 422. But, as discussed in Section III.B, *supra*, Plaintiff has not advanced a cat's paw theory here. Nor has he explained why such a theory, which involves a non-decisionmaker exerting influence over a decisionmaker—usually a superior—to cause an adverse employment action, should be extended to a situation in which an allegedly retaliating supervisor—here, Kent—terminated an employee and that decision

to terminate later caused a different decisionmaker with whom Kent had no contact—here, Hayes—to rescind a tentative job offer.[18]

There are several reasons why the Court will not just accept Plaintiff's theory on faith. For example, as the Supreme Court in *Staub* emphasized, for discriminatory or retaliatory animus to be imputed from one employee or official to another, the one engaging in biased conduct must have "*intended* . . . to cause an adverse employment action." 562 U.S. at 422. The Court explained that "[u]nder traditional tort law, '"intent" denotes that the actor desires to cause [the] consequences of his act, or that he believes the consequences are substantially certain to result from it.'" *Id.* at 422 n.3 (quoting Restatement (Second) of Torts § 8A). That is, the biased official must do something—like (as in Plaintiff's hypothesis here) fabricate or exaggerate instances in which the plaintiff engaged in inappropriate conduct—either (1) to cause the decisionmaker to take an adverse employment action against the plaintiff or (2) with the belief that the decisionmaker is substantially certain to take such action because of that fabrication. But, where the allegedly biased official—Kent—was entirely insulated from Hayes, the person who made the ultimate decision on rescission, *see* ECF No. 73-2 at 21, can Kent be said to have (1) "intended" to cause Hayes to take an adverse employment action against Plaintiff or (2) believed that Hayes was substantially likely to take adverse action because of that earlier conduct? Or, more precisely, could a reasonable jury so find based on this record? Relatedly, can Kent's termination of Plaintiff be considered the proximate cause of Hayes' rescission of a job offer Kent knew nothing about, or is the link between the two actions "too remote, . . . contingent, or indirect" to establish causation? *Staub*, 562 U.S. at 419 (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)). Indeed, accepting that

---

[18] The Court does not address whether, if Plaintiff could show that his termination was retaliatory, he might be entitled to damages related to the rescission of the job offer; that is not the question presented. Rather, the government seeks dismissal of Plaintiff's claim for retaliation based on the rescission of the tentative job offer, not a ruling on an issue of available damages.

liability for retaliation is transitive in the manner Plaintiff proposes would mean Plaintiff could have applied for multiple jobs at FEMA after he was fired and, when rejected, claimed that each rejection was an actionable retaliatory failure-to-hire based on that prior "tainted" termination. That seems an expansion of Title VII liability without doctrinal support. Plaintiff makes no attempt to address issues like these, which are fundamental to his notion of derivative liability.

In short, Plaintiff has provided no argument or case law to support his theory, and the Court will not do his work for him. He has thus forfeited any argument that, in these circumstances, an employer may be liable for a non-retaliatory adverse employment action "deriv[ed]" from an earlier retaliatory adverse employment action, ECF No. 73 at 18. *See Vásquez Rijos*, 119 F.4th at 112 n.12; *Berkowitz*, 927 F.2d at 1384; *Zannino*, 895 F.2d at 18; *see also Sineneng-Smith*, 590 U.S. at 375–76; *Jones*, 835 F.3d at 83. And, again, even if Plaintiff had bothered to support his argument and succeeded in persuading the Court that his theory is cognizable, Defendant would still be entitled to summary judgment because the underlying premise—that Plaintiff's termination was retaliatory—is unsupported.

Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claim based on the rescission of his tentative job offer.

## IV. CONCLUSION

Plaintiff has not raised a genuine issue of material fact as to his retaliation claims. His demobilization preceded his protected activity and he has not pointed to evidence that would allow a reasonable factfinder to determine either that Kent fired him or that Hayes did not hire him in retaliation for seeking informal EEO counseling. Indeed, Plaintiff's arguments largely boil down to the contention that he did not engage in (some of) the inappropriate conduct for which he was terminated. "If [a plaintiff] was fired for misconduct [he] did not actually engage in, that is

unfortunate, but a good-faith factual mistake is not the stuff of which Title VII violations are made." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 903 (4th Cir. 2017). Here, Plaintiff has not shown that a reasonable jury could find that any decisionmaker retaliated against him for his protected activity. Accordingly, Defendant is entitled to summary judgment.

A separate Order will issue.

Date: August 18, 2026

G. Michael Harvey

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE